**In re WRIGHT AIR LINES, INC., Debtor and Debtor-In-Possession.**

**Bankruptcy No. B84–02493.**

United States Bankruptcy Court, N.D. Ohio, E.D.

July 12, 1985.

Joseph C. Domiano, Diana M. Thimmig, Sindell, Sindell & Rubenstein, Cleveland, Ohio, for debtor and debtor-in-possession.

John Silas Hopkins, III, Baker & Hostetler, Cleveland, Ohio and William F. McCar-

thy, Ropes & Gray, Boston, Mass., for Shorts Air Lease, Inc.

Ellen L. Keller, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for General Elec. Credit Corp.

Marvin A. Sicherman, Dettelbach & Sicherman, Cleveland, Ohio, for Creditors' Committee.

## MEMORANDUM OF OPINION AND ORDER

JOHN F. RAY, Jr., Bankruptcy Judge.

This matter came on for hearing upon the motion of Shorts Air Lease, Inc. ("Shorts"), a creditor of Wright Air Lines, Inc. ("Wright"), debtor-in-possession, to convert Wright's Chapter 11 case to a Chapter 7 pursuant to Section 1112(b) of the Bankruptcy Code. Alternatively, Shorts has requested that this Court appoint a trustee pursuant to Section 1104(a) of the Bankruptcy Code. After consideration of the evidence introduced at the hearing, the briefs and proposed findings of fact and conclusions of law submitted by counsel for both sides, and the relevant case law, this Court makes the following findings of fact and conclusions of law.

### I. *Appointment of a Trustee*

Under Section 1104, the Court may order the appointment of a trustee: "(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case ... or (2) if such appointment is in the interests of creditors...." Shorts bases its motion for appointment upon two separate grounds. First, Shorts alleges that Wright's management made deliberate misrepresentations in a registration statement filed with the Securities and Exchange Commission ("SEC"). Second, Shorts alleges that Wright has been mismanaged and funds have been applied to payment of indebtedness for which Wright's officers, directors and principal shareholders were personally liable.

On February 13, 1984, Wright's registration statement filed with the SEC became

effective. Wright offered for public sale 8,050,000 shares of common stock; First Jersey Securities, Inc. was the underwriter. After underwriting discount, the proceeds to Wright were not less than $6,242,000. Shorts alleges that the registration statement contained untrue statements of material facts, or omitted stating material facts necessary to make the statements therein not misleading. Shorts alleges that as of the effective date of the registration statement, Wright was experiencing severe cash flow difficulties and had, therefore, incurred substantial amounts of short-term credit. The registration statement stated that 24 percent of the proceeds of the offering would be used to "retire indebtedness," and that the remaining 76 percent would be allocated to advertising and promotional expense, aircraft purchasing and refurbishing and general expansion of Wright. In fact, at a board meeting less than a week before the effective date of the registration statement, Gilbert Singerman, Wright's president, told the Wright board of directors that after Wright met its current commitments and obligations, only $1,000,000 would remain from the offering proceeds. Furthermore, the registration statement failed to disclose that over $1,800,000 would be paid to Huntington Bank out of the offering proceeds.

In its defense, Wright points to portions of the registration which it claims revealed the information which Shorts alleges was missing. The substantial losses were revealed under the heading "RISK FACTORS," and the net working capital deficit was revealed to be $2,601,104 as of September 30, 1983. As for the payment to Huntington Bank, Wright points to the following language included on page 13 of the registration statement under the heading "Use of Proceeds":

In the event that the net proceeds should be insufficient to provide funds for all of the purposes outlined above, or in the event that the company's circumstances should change, *management reserves the right to use the proceeds in the manner it considers most prudent.* In either of those events, management does not anticipate allocating any of the proceeds to different uses. Rather, management anticipates proportionately reducing the amount allocated to each use, on the one hand, *or using the proceeds for the retirement of indebtedness,* prepayment on aircraft purchase, refurbishing of aircraft, and advertising to promote existing routes, rather than developing new routes on the other hand.

Shorts' Ex. 25, p. 13 (emphasis added). In addition to reserving the right to use proceeds as it deemed prudent, Wright also claims that it fully disclosed its obligation to The Huntington National Bank. The registration statement contained the following paragraph regarding the loan:

Management anticipates that future capital needs will be met by raising additional equity, funds generated internally from operations, and additional borrowing. In addition, equipment may be leased instead of purchased to reduce capital requirements. With respect to the repayment of the $3.4 million owed to The Huntington National Bank of Northeast Ohio and due January 1, 1985, management is hopeful of being able to roll that loan over or of converting it into a long-term pay-out loan. No assurance can be given, however, that the Bank will agree to a rollover or conversion.

While this Court need not, and should not, decide whether Wright's registration statement violated the rules of the SEC, it is clear that "fraud" or "dishonesty" within the meaning of Section 1104 has been shown. Wright knew on the effective date of the registration statement that it would use all but one million dollars of the offering proceeds to retire existing debt. Wright's statement that it reserved the right to use the proceeds differently falls well short of full disclosure of its future plans. Wright's concealment of its true intentions with regard to the offering proceeds is the kind of dishonesty which Section 1104 was designed to prevent.

## II. *Conversion to Chapter 7*

Under Section 1112(b), the Court may convert a case under Chapter 11 to Chapter

7, or may dismiss the case for cause, including: (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; or (3) unreasonable delay by the debtor that is prejudicial to creditors. Other grounds, not relevant here, are also given.

The two factors which militate most strongly in favor of not granting Shorts' motion to convert are the presence of a trustee and the lapse of the exclusivity period. In *Matter of Coral Air, Inc.*, 40 B.R. 979 (D.V.I.1984), the creditors moved for conversion under Section 1112(b)(7) and (8) for the debtor's failure to meet the terms and conditions of its approved plan of reorganization. The district court noted several instances of fraudulent actions by the directors and officers of the debtor airline, but held the motion to convert in abeyance "because of the faint hope that Coral Air can survive." *Id.* at 984. The court then instituted stringent controls over future operations of the debtor. These same stringent controls might be instituted by a trustee appointed by this Court to operate the debtor. With such controls, this Court might be assured that conversion is unnecessary. Unfortunately, given the fairly esoteric nature of the airline industry, nearly any trustee would have to rely heavily upon current management for advice as to the future direction for Wright. It is this same management, of course, which has proved so ineffective to date.

The second factor is the expiration of the exclusivity period. As of February 1, 1985, any party in interest in this case has the right to file and seek confirmation of a plan of reorganization, including a liquidating plan. Should Wright's future operations prove unsuccessful or unsatisfactory to its creditors, a liquidating plan might be a viable option. However, the administrative costs of such a plan, assuming a trustee is appointed, would undoubtedly be greater than those incurred under a Chapter 7 liquidation.

At the hearing on Shorts' motion, the following financial picture of Wright emerged. Wright's assets consist of: one plane worth approximately $15,000; leases, without ownership options, for ground equipment; accounts receivable worth $60,000 to $70,000; a land lease for a hanger at Burke Airport worth approximately $100,000 to $150,000; and various miscellaneous parts located in a warehouse in Cleveland. Gilbert Singerman, Wright's president, projects revenues of $525,000 from sales of seats on flights between Cleveland and Detroit, plus charter operations and fixed base operations. Expenses for each month prior to April, 1985 exceeded $525,000. Expenses for April totalled $479,000; this figure did not include payments on aircraft leased from Holland Industries. Thus, Wright's projected revenues would not have been sufficient during any recent month to cover operating expenses. Wright's president testified that Wright intended to eliminate its overhead burden while expanding its services. This Court frankly doubts that costs can be further reduced in any meaningful fashion; as to expansion, the start-up costs of a run to a different city would be $150,000, and Wright does not now have this money.

Wright has presented testimony with regard to new operating plans and large infusions of new operating capital, which it claims will resolve Wright's current dilemmas. This Court remains skeptical about the sources of such financing, and also doubts Wright's ability to make effective use of new funding. Operating reports for February, March and April, 1985 reveal the following (Shorts Ex. 52–54):

|  | February | March | April |
|---|---|---|---|
| Operating Receipts | $621,058 | $454,831 | $520,404 |
| Operating Expenses | $629,674 | $653,832 | $479,907 |
| Cash On Hand | $ –0– | ($210,491) | $ 19,506 |
| Post-Filing Expenses | $653,974 | $769,306 | N/A |

Wright's April report contains no figures for accounts payable. To date, neither the April accounts payable figures nor an operating report for the month of May have been filed with this Court. Assuming no additional post-petition expenses were incurred during April or May, the proposed

investment of Holland Industries of $750,000 in working capital would merely pay off post-filing expenses. Nor has Wright done particularly well with past infusions of capital. For the six months ended June 30, 1984, despite the proceeds from the public offering, Wright showed a net decrease in working capital of $1,299,638 (Shorts Ex. 33).

■ Rehabilitation as used in 11 U.S.C. Section 1112(b)(1) means "to put back in good condition; re-establish on a firm, sound basis." 5 *Collier on Bankruptcy* ¶ 1112.03(2) at 14 (15th ed. 1980). As noted in *In re L.S. Good & Co.*, 8 B.R. 315, 318 (Bankr.N.D.W.Va.1980): "Debtors should not continue in control of their businesses under the umbrella of the reorganization court beyond the point at which reorganization no longer remains a realistic undertaking, unless liquidation would proceed more expeditiously and less expensively under the control of the debtor." Given management's recent track record, and the heavy involvement of Wright's directors in lease contracts with Wright, this Court is in agreement with the court in *L.S. Good*, which further stated:

> There is nothing in the record of these proceedings to suggest that the debtor-in-possession is either better able or more motivated to proceed promptly with an efficient liquidation than is an experienced fiduciary whose commitment is to the promotion of parity among interested parties rather than to self-interest. There is every reason to believe that the substantial cost savings realized by minimizing the fees and expenses of debtor's counsel and the Creditors' Committee's counsel should more than offset the fees and expenses of a trustee.

*Id.*

■ The Court finds that there is no reasonable likelihood of rehabilitation, and that the diminution of the assets of this estate has been amply demonstrated. Shorts' motion for appointment of a trustee is, therefore, dismissed as moot, and the motion for conversion to Chapter 7 is granted.

It is, therefore, ORDERED, ADJUDGED and DECREED that Shorts' motion for conversion be, and the same is hereby granted, and this case is converted to a Chapter 7 case.