# 2000 DTA 123

### TRIBUNAL DE CIRCUITO DE APELACIONES
### CIRCUITO REGIONAL I - SAN JUAN
### PANEL III

JAIME GALLARDO HERNANDEZ, APARTADO 6856 SAN JUAN, PUERTO 00914
Apelante

v.

BANCO BILBAO VIZCAYA, AVE. FRANKLIN D. ROOSEVELT, ESQ. AVE. SAN PATRICIO, JOHN DOE C/P BUFETE MELENDEZ PEREZ, MORAN & SANTIAGO Y LOS LCDOS. CARLOS E. POLO Y WILLIAM SANTIAGO SASTRE, EN SU CARACTER INDIVIDUAL Y COMO MIEMBROS DEL BUFETE NOMBRADO Y "X" INSURANCE CO., PO BOX 19328, SAN JUAN, PUERTO RICO 00919-1328
Apelados

Núm. KLAN-99-01411

San Juan, Puerto Rico, a 29 de febrero de 2000

Panel integrado por su Presidente, el Juez Arbona Lago
y los Jueces Brau Ramírez y Urgell Cuebas

Brau Ramírez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

El apelante Jaime Gallardo Hernández solicita la revisión de una sentencia emitida el 15 de noviembre de 1999 por el Tribunal de Primera Instancia, Sala Superior de San Juan, en la demanda sobre nulidad de sentencia y daños y perjuicios presentada ante dicho foro por el apelante contra la parte apelada Banco Bilbao Vizcaya, el bufete Meléndez Pérez, Morán & Santiago y los Lcdos. Carlos E. Polo y William Santiago.

En la demanda en cuestión, el apelante solicita que se deje sin efecto una sentencia previamente dictada por el foro de instancia, el 11 de julio de 1997, en otro pleito sobre cobro de dinero y ejecución de hipoteca presentado por el Banco contra el apelante, en el cual los otros apelados habían fungido como abogados del Banco. El apelante alega que la sentencia en este otro caso fue nula, careciendo el Tribunal de Primera Instancia de jurisdicción para dictar la misma, por cuanto, al momento de emitirse dicho dictamen, el apelante había presentado una petición ante el Tribunal Federal de Quiebras.

Mediante el dictamen apelado, el Tribunal de Primera Instancia desestimó la petición de relevo de sentencia del apelante, al concluir que los procedimientos ante el foro de quiebras aún no han concluido, por lo que la demanda del apelante es prematura.

Aunque coincidimos esencialmente con el razonamiento de la distinguida Sala de Primera Instancia, resolvemos que el curso más apropiado es el de paralizar los procedimientos hasta tanto el Tribunal de Quiebras adjudique los asuntos pendientes ante dicho Tribunal. Revocamos, por lo tanto, la disposición tomada por el Tribunal de Primera Instancia y, en su lugar, ordenamos a dicho foro paralizar el trámite de la demanda.

### II

Según surge del expediente, el Banco Bilbao Vizcaya es una entidad bancaria que se dedica, entre otras cosas, a la concesion de préstamos asegurados por distintas garantías.

Para la época relevante a la presente controversia, el apelante tomó varios préstamos al Banco. En particular, mediante un acuerdo de préstamo suscrito por las partes, el 19 de septiembre de 1994, el Banco Bilbao Vizcaya extendió al apelante dos préstamos, uno rotativo y otro no rotativo, por las cantidades de $110,000.00 y $240,000.00, respectivamente. El apelante suscribió un pagaré por la primera cantidad.

El apelante también tenía una línea de crédito con el Banco para garantizar sobregiros en su cuenta corriente. Además, tenía una tarjeta de crédito VISA. Finalmente, el apelante también tomó un préstamo de $100,000.00 al Banco, mediante acuerdo suscrito el 29 de diciembre de 1994. Este último préstamo estaba

representado por un pagaré garantizado por una hipoteca sobre el siguiente inmueble:

*"URBANA: Lot located in the Pueblo Ward of the Municipality of Dorado, forming part of the Dorado del Mar Development, with the number, area and boundaries related as follows: Lot number fifteen (15) of block "C", area of six hundred nineteen point two hundred sixty two (619.262) square meters, bounded at the NORTH, in a distance of thirty point two hundred and forty (30.240) meters with lot number fourteen (14) of block "C" of the Development; SOUTH, in a distance of twenty nine point five hundred twenty four (29.524) meters with lot number sixteen (16) of block "C"; EAST, in a distance of sixteen point one hundred seven (16.107) meters and twelve point seven hundred sixty six (12.766) meters with Dorado del Mar Golf Course of the Development; and WEST, in a distance of four point eight hundred eighteen (4.818) meters and twelve point one hundred fifty five (12.155) meters with Street Number Six (6)."*

Para garantizar sus otras deudas con el Banco, el apelante entregó a dicha entidad los siguientes pagarés hipotecarios:

*"(1) Pagaré hipotecario por $15,250 de principal, pagadero al R&G Federal Savings Bank o al tenedor por endoso, o a su orden y a la demanda, suscrito por Jaime Gallardo Hernández el 8 de noviembre de 1991, bajo el afidávit número 2551 del Notario Andrés Montañez Coss y garantizado por hipoteca constituida mediante la escritura número 201 de la misma fecha y ante el mismo notario.*

*(2) Pagaré hipotecario por $113,625 de principal, pagadero a R&G Federal Savings Bank, o al tenedor por endoso, o a su orden y a la demanda, suscrito por Jaime Gallardo Hernández el 8 de noviembre de 1991, bajo el afidávit número 2543 del Notario Andrés Montañez Coss, garantizado con hipoteca constituida mediante la escritura número 192, otorgada en la misma fecha y ante el mismo notario.*

*(3) Pagaré hipotecario por $29,775 de principal, pagadero a R&G Federal Savings Bank o al tenedor por endoso, o a su orden y a la demanda, suscrito por Jaime Gallardo Hernández el 8 de noviembre de 1991, bajo el afidávit número 2544 del Notario Andrés Montañez Coss, garantizado con hipoteca constituida mediante la escritura número 194, otorgada en la misma fecha y ante el mismo notario.*

*(4) Pagaré hipotecario por $41,716 de principal, pagadero a R&G Federal Savings Bank, o al tenedor por endoso, o a su orden y a la demanda, suscrito por Jaime Gallardo Hernández el 8 de noviembre de 1991, bajo el afidávit número 2550 del Notario Andrés Montañez Coss, garantizado con hipoteca constituida mediante la escritura número 200, otorgada en la misma fecha y ante el mismo notario.*

*(5) Pagaré hipotecario por $21,175 de principal, pagadero a la orden de Banco Bilbao Vizcaya y a su presentación, suscrito por Jaime Gallardo Hernández el 19 de septiembre de 1994, bajo el afidávit número 542 de la Notario Georgiana S. Colón, garantizado con hipoteca constituida mediante la escritura número 33, otorgada en la misma fecha y ante la misma notario.*

*(6) Pagaré hipotecario por $9,105 de principal, pagadero a la orden de Banco Bilbao Vizcaya y a su presentación suscrito por Jaime Gallardo Hernández el 19 de septiembre de 1994, bajo el afidávit número 539 de la Notario Georgiana S. Colón, garantizado con hipoteca constituida mediante la escritura número 30, otorgada en la misma fecha y ante la misma notario.*

*(7) Pagaré hipotecario por $11, 164 de principal, pagadero a la orden de Banco Bilbao Vizcaya y a su presentación, suscrito por Jaime Gallardo Hernández el 19 de septiembre de 1994, bajo el afidávit número 540 de la Notario Georgiana S. Colón, garantizado con hipoteca constituida mediante la escritura número 31, otorgada en la misma fecha y ante la misma notario."*

Los pagarés antes mencionados estaban garantizados por hipotecas sobre los siguientes inmuebles:

*"a. Para garantizar el pagaré hipotecario descrito en el párrafo (1), el apelante constituyó hipoteca sobre la siguiente propiedad:*

*RUSTICA: Parcela de terreno en el Barrio Río Guaynabo, Puerto Rico, de forma irregular, formando un triángulo con un área superficial de quinientos siete punto cuarenta y cuatro metros cuadrados (507.44 m.c. ), que colinda por el NORTE, en un punto con la Carretera Número Uno (1) de Río Piedras a Caguas y en ocho punto cero tres metros (8.03 m.) con el área dedicada a parada en dicha Carretera Insular; por el SUR, en veinticuatro punto noventa y cinco metros (24.95 m.) con Ramón Silva y en ocho punto cuarenta y seis metros (8.46 m.) con el área de parada de dicha carretera; por el ESTE, en cincuenta y nueve punto cero cuatro metros (59.04 m.) con la Carretera Insular Número Uno (1) y con Emeterio Pérez; y por el OESTE, en cincuenta y cinco punto sesenta y un metros (55.61 m.) con la Carretera Insular Número Uno (1) de Río Piedras a Caguas.*

*b. Para garantizar los pagarés descritos bajo los párrafos (2) y (5) citados anteriormente, el apelante constituyó hipotecas sobre la siguiente finca:*

*URBANA: Parcela de terreno identificada como solar número dos (2) del Bloque "AS" de la Urbanización Villa del Río-Oeste, Sección Pradera, radicado en el Barrio Palmas de Cataño. Puerto Rico, con una cabida superficial de trescientos diez punto quinientos metros cuadrados (310.500 m.c.) y en lindes por el NORTE, en veintitrés metros (23.00 m.) con el solar número uno (1); por el SUR, en veintitrés metros (23.00 m.) con el solar número tres (3); por el ESTE, en trece punto cuarenta metros (13.40 m. ) con la Calle Diecisiete (17); y por el OESTE, en trece punto cincuenta metros (13.50 w..) con los solares quince y dieciséis (15 y 16). Enclava una casa de concreto diseñada para una familia.*

*c. Para garantizar los pagarés descritos en los incisos (3) y (6), se constituyeron hipotecas sobre la siguiente propiedad:*

*URBANA: PROPIEDAD HORIZONTAL: Apartment number eight hundred three (803) of the property governed by the regulations of horizontal property known by the name of Unión Norte Building, located at number six hundred sixty four (664) on Unión Street, Miramar, Santurce, Puerto Rico and with a floor area of thirty point ninety two square meters (30.92 sq. mts.), more or less, said apartment being located immediately to the east of the stair and elevator area of the eight (8th) floor of the building, the main entrance door of which inmediately communicates with the lobby which is one of the communal facilities of the building. The limits of this apartment are, bounding by the NORTH, in five point ninety seven meters (5.97m.) with apartment eight hundred four (804); by the SOUTH, in five point ninety seven meters (5.97 m.) with apartment eight hundred two (802); by the WEST, in five point eighteen meters (5.18 m.) with the lobby and by the EAST, in five point eighteen meters (5.18 m.) with the front wall of the building. The apartment contains the following rooms and facilities: one studio room, one bathroom and kitchen.*

*Le corresponde uno punto cincuenta veinticinco porciento (1.5025%) en los elementos comunes.*

*d. Para garantizar los pagarés descritos bajo los incisos (4) y (7), el apelante constituyó hipotecas sobre la siguiente propiedad:*

*RUSTICA: Parcela número uno (1). Solar de forma triangular en el Barrio Cedros de la jurisdicción de Carolina, Puerto Rico, con una cabida superficial de seiscientos sesenta y cinco metros cuadrados (665.00 m. c.), colinda por el NORTE, con Camino Municipal que lo separa de terrenos de Ramón Nieves, en una distancia de treinta y nueve metros (39.00 m.); por el NORESTE, en cincuenta y dos metros (52.00 m.) con Camino Municipal pavimentado y por el OESTE, en dirección Sureste, en cuarenta y tres metros (43.00 m.) con la parcela número seis (6) de Dionisio Rodríguez.*

*Enclava casa de concreto armado y bloques de cemento, de veintiseis (26) pies de frente por cuarenta (40)*

*de fondo que consta principalmente de sala, comedor, cocina, tres (3) cuartos dormitorios con closets, baño y marquesina que mide doce (12) pies de frente por veinte (20) de fondo."*

El apelante confrontó problemas para satisfacer sus obligaciones al Banco. Oportunamente, en o cerca del 20 de mayo de 1996, el Banco instó una demanda en cobro de dinero y ejecución de hipoteca contra el apelante, reclamando que éste le adeudaba la cantidad de $386,895.72 y solicitando la ejecución de las propiedades mencionadas anteriormente, caso civil núm. KCD96-0257. El Banco compareció en dicho pleito a través de la representación del Lcdo. Carlos Polo del bufete Meléndez Pérez, Morán & Santiago. Posteriormente, también compareció el Lcdo. William Santiago Sastre en la misma capacidad.

Aparentemente, el apelante contestó la demanda, negando las alegaciones.

Según surge del expediente, en o cerca de esta época, el Banco también presentó otras dos demandas en cobro de dinero ante el Tribunal de Primera Instancia, Subsección de Distrito, Sala de Toa Alta, reclamando otras sumas al apelante, casos TD96-272 y TD96-895. En particular, el Banco reclamó deudas de $7,923.36 y $16,184.11, respectivamente, más gastos, intereses y honorarios de abogado.

Para esta fecha, otras instituciones bancarias también estaban reclamando al apelante el pago de distintas deudas.

Así las cosas, el Banco Bilbao Vizcaya presentó una moción de sentencia sumaria, alegando que no existía controversia real sustancial en torno a los hechos y que el apelante debía las cantidades reclamadas.

El 27 de mayo de 1997, mientras dicha solicitud se hallaba pendiente, el apelante presentó una solicitud ante el Tribunal Federal de Quiebras bajo el Capítulo 13 del Código de Quiebras. El Tribunal federal emitió la correspondiente notificación de paralización, conforme a lo dispuesto en 11 U.S.C. sec. 362.

El 11 de julio de 1997, antes de que el Tribunal de Primera Instancia fuera notificado de la presentación de la paralización, dicho foro emitió una sentencia sumaria declarando con lugar la demanda y condenando al apelante a satisfacer al Banco la suma de $386,895.72 por concepto de principal adeudado, más $21,615.52 por concepto de intereses, así como las costas del litigio y $38,689.00 por concepto de honorarios de abogado. El Tribunal ordenó la ejecución de las hipotecas antes enumeradas, en pago de la deuda.

El 17 de julio de 1997, antes de que la sentencia emitida por el Tribunal de Primera Instancia hubiera advenido final y firme, el apelante notificó a dicho foro de la presentación de su petición ante el Tribunal de Quiebras.

El 22 de agosto de 1997, el Banco presentó una reclamación *("proof of claim")* contra el apelante ante el foro de Quiebras, alegando que el apelante le debía las cantidades expresadas por el Tribunal de Primera Instancia en su sentencia del 11 de julio de 1997, las cuales constituían una deuda asegurada, según las determinaciones del foro de Primera Instancia.

Posteriormente, durante una vista celebrada ante el Tribunal de Quiebras, el 28 de mayo de 1998, dicho foro ordenó la conversión de la petición del apelante a una bajo el Capítulo 7 del Código Federal de Quiebras y procedió a designar un síndico para que llevara a cabo la liquidación de los bienes del apelante. Durante la discusión de ese día, el apelante cuestionó la validez de la deuda reclamada por el Banco, alegando que la sentencia del Tribunal de Primera Instancia había sido emitida, luego de la orden de paralización del foro de Quiebras, la cual había sido desacatada por el Banco. Según se desprende de la minuta, el Magistrado de Quiebras no llegó a adjudicar este planteamiento, dejando el mismo pendiente hasta recibir la recomendación del síndico.

Posteriormente, el 3 de diciembre de 1998, el apelante instó la presente acción por nulidad de sentencia y daños y perjuicios contra los apelados. En su demanda, el apelante reclamó que la sentencia emitida por el Tribunal de Primera Instancia el 11 de julio de 1997, en el caso KCD96-0257, era nula por contravenir la orden de paralización del Tribunal Federal de Quiebras. El apelante alegó que dicha sentencia le había ocasionado daños, al propiciar que el Banco presentara reclamaciones incorrectas ante el Tribunal de Quiebras, lo que derrotó su solicitud bajo el Capítulo 13 del Código Federal de Quiebras. El apelante atribuyó dichos daños, además, a la conducta negligente y/o antiética de los abogados del Banco, quienes supuestamente tenían conocimiento de la presentación de la petición de quiebras del apelante.

Los apelados comparecieron separadamente y solicitaron la desestimación de la demanda. Los abogados del Banco alegaron que el apelante no tenía legitimación activa para instar la reclamación, sino que dicho derecho correspondía ejercitarlo al síndico, por constituir parte del caudal del deudor. Por su parte, el Banco planteó que la solicitud de relevo de sentencia del apelante era prematura, por cuanto la sentencia emitida por el Tribunal de Primera Instancia no era final y firme, ya que los procedimientos habían quedado paralizados por la petición de quiebras.

El apelante se opuso a las mociones de los apelados.

El 15 de noviembre de 1999, mediante la sentencia apelada, el Tribunal de Primera Instancia declaró con lugar las mociones de desestimación de los apelados y ordenó el archivo de la demanda del apelante.

En su sentencia, la distinguida Sala apelada observó que el remedio de relevo de sentencia de ordinario sólo procede contra un dictamen final y firme del Tribunal. Concluyó:

*"En el caso ante nos, se aduce la causal de nulidad de la sentencia dictada, pero dicha sentencia aún no es final y firme debido a que el Tribunal paralizó los procedimientos del caso a petición del propio demandante. Tal paralización produjo el efecto de dejar en suspenso la sentencia, por lo cual ésta no puede ser ejecutada."*

Debido a que la sentencia que alude el demandante es una que no es final ni firme, no procede la acción independiente para solicitar nulidad de la sentencia. La solicitud del demandante es una prematura. Para que proceda una acción independiente de nulidad de sentencia tiene que al menos haber una sentencia final y firme sobre la cual se pueda decretar dicha nulidad.

El Tribunal procedió a desestimar la demanda. Insatisfecho, el apelante acudió ante este Tribunal.

## III

En su recurso, el apelante plantea que erró el Tribunal de Primera Instancia al desestimar la demanda, incluyendo la reclamación por daños contra los letrados co-demandados, la cual es un reclamo independiente a la solicitud de relevo de la sentencia del caso KCD-96-0257.

No percibimos, sin embargo, error alguno en la actuación del foro de Primera Instancia.

El Código de Quiebras dispone la paralización automática de cualquier acción judicial presentada contra un deudor que ha presentado una petición de quiebras ante el foro federal. 11 U.S.C. sec. 362(a). Véase, además, *In re: Soares*, 107 F.3d 969, 975 (1st Cir. 1997); *Sunshine Dev., Inc. v. FDIC*, 33 F. 3d 106, 113 (1st Cir. 1994); *Interstate Commerce Commission v. Holmes Transportation, Inc.*, 931 F.2d 984, 987-988 (1st Cir. 1991).

Dicha paralización se extiende hasta finalizar los procedimientos ante dicho foro. 11 U.S.C. sec. 362(c) (2). Véase, *In re: Soares*, 107 F.3d, a la pág. 975; *In re: Rodríguez*, 97 B.R. 136, 138 (D.P.R. 1988); *In re: 12 th and N Joint Venture*, 63 B.R. 36, 38 (D.C. 1986).

En la situación de autos, no cabe duda que los procedimientos contra el apelante en el caso KCD96-0257 quedaron paralizados pendiente la adjudicación final de su solicitud de quiebras. El apelante no ha certificado que los procedimientos ante el foro de Quiebras hubieran finalizado, por lo que debemos concluir que dicha paralización se encuentra en vigor.

El apelante ha planteado que la sentencia emitida por el Tribunal de Primera Instancia es nula por haber sido emitida con posterioridad a la presentación de su solicitud de quiebras. Ello probablemente sucedió, según hemos visto, porque al momento de emitir su sentencia, el 11 de julio de 1997, el Tribunal no había sido notificado por el apelante de la presentación de su petición de quiebras, lo que el apelante hizo seis días después, el 17 de julio de 1998.

No obstante, está claro que el foro local carece de jurisdicción, en esta etapa, para emitir juicio alguno sobre las consecuencias legales, si alguna, de esta situación. El asunto está ante la consideración del Tribunal de Quiebras, quien tiene pendiente ante sí una moción de desacato presentada por el apelante.

Por la misma razón, no cabe que el foro local se pronuncie sobre la conducta de los abogados del Banco. En su recurso, el apelante plantea que las causas de acción ejercitadas por él contra dichas partes son distintas y separables a su solicitud de relevo de sentencia contra el Banco, por lo que no existe impedimento de que las mismas sean ventiladas en este momento.

Lo cierto es, sin embargo, que las alegaciones presentadas contra los abogados del Banco tienen su origen en la alegada conducta de éstos de violar deliberadamente la orden de paralización del Tribunal de Quiebras. Los daños alegados por el apelante, en este sentido, se refieren a la determinación de dicho foro de no admitir su petición bajo el Capítulo 13 del Código Federal de Quiebras. Se trata, pues, de las mismas materias que en esta etapa están ante la consideración del Tribunal de Quiebras y sobre las cuales éste goza de jurisdicción exclusiva. Corresponderá a dicho Foro determinar, en su día, si medió algún incumplimiento intencional con la paralización automática establecida por la ley federal, así como proveer el remedio apropiado para dicha violación. El dictamen que emita el Tribunal de Quiebras sobre el asunto, tendrá un efecto directo sobre la causa de acción ejercitada por el apelante contra los apelados ante el Tribunal de Primera Instancia.

En estas circunstancias, entendemos que lo procedente es que se paralice la dilucidación del caso de autos, hasta tanto concluyan los procedimientos ante el Tribunal federal. Es apropiado, además, ordenar la consolidación del caso de autos con el caso KCD96-0257, cuya sentencia, según observara el Tribunal de Primera Instancia, no goza aún de finalidad, toda vez que se trata de procedimientos que envuelven asuntos comunes. Véase, la Regla 38.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 38.1; *Vives Vázquez v. Estado Libre Asociado*, ___ D.P.R. ___ (1996), **96 J.T.S. 164.**

En su comparecencia, los abogados demandados han planteado que la demanda del apelante está prescrita. En vista de lo expresado anteriormente, declinamos emitir juicio alguno sobre los méritos de la reclamación del apelante, al igual que no lo hizo el Tribunal de Primera Instancia.

Por los fundamentos expresados, se revoca la sentencia apelada. En su lugar, se ordena la consolidación del caso de autos con el caso KCD-96-0257 presentado ante el Tribunal de Primera Instancia, Sala de San Juan, y la paralización de los procedimientos, hasta tanto hubiera concluido el trámite seguido por el apelante ante el Tribunal Federal de Quiebras.

Lo pronunció y manda el Tribunal y lo certifica la señora Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General